*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0080p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

UNITED STATES OF AMERICA,

        *Plaintiff-Appellant*,

    *v.*

DTE ENERGY COMPANY; DETROIT EDISON
COMPANY,

        *Defendants-Appellees*.

No. 11-2328

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:10-cv-13101—Bernard A. Friedman, District Judge.

Argued: November 27, 2012

Decided and Filed:  March 28, 2013

Before:  BATCHELDER, Chief Judge; DAUGHTREY and ROGERS, Circuit
Judges.

_____

## COUNSEL

**ARGUED:** Thomas A. Benson, UNITED STATES DEPARTMENT OF JUSTICE,
Washington, D.C., for Appellant. F. William Brownell, HUNTON & WILLIAMS LLP,
Washington, D.C., for Appellees.  **ON BRIEF:** Thomas A. Benson, Sambhav N.
Sankar, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for
Appellant. F. William Brownell, Mark B. Bierbower, Makram B. Jaber, HUNTON &
WILLIAMS LLP, Washington, D.C., Harry M. Johnson III, George P. Sibley III,
HUNTON & WILLIAMS LLP, Richmond, Virginia, Michael J. Solo, DTE ENERGY
COMPANY, Detroit, Michigan, for Appellees.  William L. Wehrum, HUNTON &
WILLIAMS LLP, Washington, D.C., Jessie J. Rossman, NATURAL RESOURCES
DEFENSE COUNCIL, Chicago, Illinois, for Amici Curiae.

ROGERS, J., delivered the opinion of the court, in which DAUGHTREY, J.,
joined. BATCHELDER, C. J. (pp. 14–16), delivered a separate dissenting opinion.

———————————

**OPINION**

———————————

ROGERS, Circuit Judge.    Environmental Protection Agency regulations implementing the Clean Air Act require owners and operators of any major pollutant emitting source who plan construction projects at the source to make a preconstruction projection of whether and to what extent emissions from the source will increase following construction.   That projection determines whether the project constitutes a "major modification" and thus requires a permit.   This appeal raises a single question: can EPA challenge that projection before there is post-construction data to prove or disprove it?   The district court held that it cannot and granted summary judgment to defendants DTE Energy and Detroit Edison.   While the regulations allow operators to undertake projects without having EPA second-guess their projections, EPA is not categorically prevented from challenging even blatant violations of its regulations until long after modifications are made.   The district court's sweeping reading of the regulations to that effect is at odds with the Clean Air Act.   It is therefore necessary to reverse and remand.

I.

A.

The 1977 Amendments to the Clean Air Act created a program titled New Source Review.[1]   New Source Review forbids the construction of new sources of air pollution without a permit.   42 U.S.C. § 7475.   In order to achieve the act's goals of "a proper balance between environmental controls and economic growth," sources already in existence when the program was implemented do not have to obtain a permit unless and until they are modified.   *New York v. EPA*, 413 F.3d 3, 13 (D.C. Cir. 2005) (quoting 123 Cong. Rec. 27,076 (1977) (statement of Rep. Waxman)).   Congress defined a

———————————

[1]New Source Review actually consists of two programs:  Nonattainment New Source Review for areas classified as "nonattainment" for certain pollutants and Prevention of Significant Deterioration for areas classified as "attainment."   Monroe, Michigan actually falls into both categories depending on the pollutant.   The two programs are generally parallel and their differences do not affect this case.

modification as "any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted." 42 U.S.C. § 7411(a)(4). EPA requires owners or operators[2] of sources to obtain permits if they plan a "major modification." A source is anything that has the potential to emit large quantities of a regulated pollutant. A major modification is "any physical change in or change in the method of operation of a major stationary source that would result in: a significant emissions increase . . . of a regulated [New Source Review] pollutant . . . and a significant net emissions increase of that pollutant from the major stationary source." 40 C.F.R. § 52.21(b)(2)(i). To determine whether an emissions increase is significant, an operator consults a chart included in the regulation. For example, an increase of forty tons per year of nitrogen oxides or sulfur dioxide is significant. *See id.* § 52.21(b)(23)(i). If the emissions increase is significant, the operator must obtain a permit. The permit would require the facility to use "best available control technology" for each regulated pollutant.[3] 42 U.S.C. § 7475(a)(4). For grandfathered sources, installing this technology generally leads to a drastic decrease in emissions, even when compared to the preconstruction baseline, at great expense for the operator.

In order to determine whether a proposed change would cause a significant emissions increase, and thus require a permit, an operator must project post-change emissions. Before 1992, EPA required operators to use a test called the "actual-to-potential test." That test requires operators to determine the maximum potential emissions of the source after the change and compare them to current emissions. If the difference is "significant," as defined by the chart, the change is considered a major modification. 40 C.F.R. § 52.21(a)(2)(iv)(d). However, the Seventh Circuit struck down that test as a requirement for power plants in *Wisconsin Electric Power Co. v. Reilly*,

---

[2]This opinion will refer to both owners and operators as "operators." The same regulations apply to both.

[3]Best available control technology is the standard for areas in attainment. An operator seeking a permit in a nonattainment area must meet the most stringent performance standard contained in a state implementation plan or achievable in practice. This is called the "lowest achievable emissions rate." *See* 42 U.S.C. §§ 7501(3), 7503(a)(2).

holding that it improperly relies on an assumption of continuous operations.  893 F.2d 901, 917 (7th Cir. 1990).  Accordingly, EPA instituted a new test for power plants in 1992.  The new test, called the "actual-to-future-actual" test, required operators to project the source's actual, instead of potential, emissions after the change.  *See* 57 Fed. Reg. 32,314 (July 21, 1992).  To ensure that the operators did not deliberately underestimate emissions to avoid the permit requirement, EPA required sources using this test to track their emissions for five years and provide to the reviewing authority, generally a state environmental agency, information demonstrating that the change did not result in an emissions increase.  *Id.* at 32,325.  Because the modification must be the cause of the emissions increase to qualify as a major modification, EPA allowed utilities to exclude from their calculations any increase in emissions caused by an independent factor.  *Id.* at 32,326.  Since the most common independent factor is growth in demand for electricity, the exclusion is called the "demand growth exclusion."  For the demand growth exclusion to apply, however, the pre-change source must have been able to accommodate the projected demand growth physically and legally.  EPA noted that whether the exclusion applies "is a fact-dependent determination that must be resolved on a case-by-case basis."  *Id.* at 32,327.

In 2002, EPA made more changes to the rule.  EPA restored uniformity between utility and non-utility sources by allowing both to use an "actual-to-projected-actual" test.  67 Fed. Reg. 80,186,  80,191 (Dec. 31, 2002).  EPA called this test "a sensible refinement of the rules [EPA] promulgated in 1992."  *Id.* at 80,192.  EPA noted that, for utilities, "[t]he effect of this consolidation is [to] make minor changes to the existing procedures."  *Id.*  One of these changes was that an operator "need only make and report a projection . . . when there is a reasonable possibility that the given project may result in a significant emissions increase."  *Id.*  However, utilities projecting post-change emissions of any kind would still have to submit their projections and post-construction tracked emissions to their reviewing authority.  EPA stated that the changed recordkeeping and reporting requirements would allow reviewing authorities to assure that any changes sources make are consistent with Clean Air Act requirements.  *See id.*

A number of states and environmental groups challenged the 2002 rule changes. The D.C. Circuit upheld most of the rule changes. However, the D.C. Circuit was not satisfied with the changes to the recordkeeping requirements. The court stated that "EPA has failed to explain how, absent recordkeeping, it will be able to determine whether sources have accurately concluded that they have no 'reasonable possibility' of significantly increased emissions." *New York,* 413 F.3d at 34. The court further noted that sources could take advantage of the reasonable possibility standard to avoid recordkeeping altogether, thus thwarting EPA's ability to enforce the New Source Review provisions. *Id.* EPA argued that the methodology was enforceable because EPA has inherent enforcement authority allowing it to conduct inspections and request information. The D.C. Circuit acknowledged that EPA has such inherent enforcement authority, but noted that "even inherent authority depends on evidence." *Id.* at 35. The D.C. Circuit remanded to EPA to either provide an acceptable explanation for its reasonable possibility standard or to devise an appropriately supported alternative. *Id.* at 35–36.

EPA completed the remand rulemaking in 2007 by producing the set of regulations that govern this case. EPA answered the D.C. Circuit's concerns by defining the term "reasonable possibility." There is a reasonable possibility that a project that is not a major modification may result in a significant emissions increase if the operator projects, after applying the demand growth exclusion, an actual emissions increase of at least fifty percent of what the chart defines as significant. 40 C.F.R. § 52.21(r)(6)(vi)(a). An operator making such a projection must report it to the relevant reviewing authority. *Id.* § 52.21(r)(6)(ii). Furthermore, the operator must monitor the source's emissions for at least five—and in some cases ten—years after resuming normal operations and must report its findings to the reviewing authority. *Id.* § 52.21(r)(6)(iii)–(iv). If the operator projects an actual emissions increase of less than fifty percent of what is significant, it must remove the demand growth exclusion from its projections. If, ignoring the exclusion, the projected emissions increase then becomes at least fifty percent of what is significant, the source also falls under the recordkeeping

requirement. *Id.* § 52.21(r)(6)(vi)(b). However, such a source does not fall under either the monitoring or reporting requirements described above. *Id.*

Therefore, under the current regulations, an operator seeking to determine whether a planned project requires a permit must take up to three steps. In step one, the operator calculates the unit's projected emissions. The operator then subtracts from that number the unit's current emissions and any emissions increase that qualifies for the demand growth exclusion. The resulting number is the projected emissions increase. The operator compares the projected emissions increase to the relevant number from the significance chart. If the projected emissions increase is greater, then the operator's inquiry is over and it must seek a permit from EPA or the relevant stage agency and install expensive modern pollution-control technology. If the projected emissions increase is lower, however, then the operator moves on to step two.

In step two, the operator cuts the significance number in half and compares the numbers again. If the projected emissions increase is now higher, the operator does not have to obtain a permit or install pollution-control technology, but must report its calculations to the relevant agency, monitor its emissions for at least five years, and report to the relevant agency if its projections prove to have been too conservative. If the projected emissions increase is still lower, however, then the operator moves on to step three.

In step three, the operator adds back into its projected emissions increase any emissions it originally subtracted under the demand growth exclusion. The operator then compares the resulting number with half of the significance number. If the resulting number is higher, then the operator must maintain a record of its calculations. However, it does not have to obtain a permit, does not have to report anything to the relevant agency, and does not have to monitor future emissions. If the resulting number is still lower, however, the operator does not have to do anything and may destroy its records if it so chooses.

Whether a permit is ultimately required is a high stakes determination. If the operator needs to obtain a permit, the source loses grandfathered status under the Clean

Air Act. This means the operator must install modern pollution controls such as flue gas desulfurization for sulfur dioxide and selective catalytic reduction for nitrogen oxides. These pollution controls lead to enormous emissions reductions. For example, EPA's expert estimated that installation of these modern pollution controls at DTE's Monroe Unit #2, the source at issue in this case, would reduce the plant's sulfur dioxide emissions by at least 95% and its nitrogen oxide emissions by at least 90%. However, installing these complex technologies is very expensive for operators. According to DTE, it is spending $1.7 billion to install these technologies at Monroe. *DTE Energy: Emissions Controls*, http://www.dteenergy.com/dteEnergyCompany/environment/generation/controls.html (last visited Mar. 25, 2013).

## B.

Detroit Edison owns and operates, and DTE operates, the Monroe Power Plant in Monroe, Michigan. In March 2010, DTE began a construction project at Monroe Unit #2. The project included replacing approximately 2,000 square feet of tubing, the economizer, and large sections of reheater piping; installing a new nine-ton exciter, a device that provides voltage that creates the electromagnetic field needed for the rotor to produce electricity; and refurbishing boiler feedwater pumps. The project required approximately 83 days, 600 construction workers, and $65 million. DTE performed the required emissions calculations and projected a post-project emissions increase of 3,701 tons per year of sulfur dioxide and 4,096 tons per year of nitrogen oxides. According to the regulations, an increase of 40 tons per year of either sulfur dioxide or nitrogen oxides is significant. 40 C.F.R. § 52.21(b)(23)(i). However, DTE determined that the entire emissions increase fell under the demand growth exclusion. DTE submitted these calculations to its reviewing authority, the Michigan Department of Environmental Quality, noting that DTE "continues to believe there is no reasonable possibility that the proposed project will result in a significant emissions increase and thus [notification, recordkeeping, and reporting] requirements do not apply." DTE then

began the project. The Michigan Department of Environmental Quality did not take any action in response to DTE's submission.

EPA learned of the construction project in May of 2010, two months after the project began. On June 4, 2010, EPA issued a notice of violation. The notice stated that the project "resulted in a significant net emissions increase" and therefore "constitutes a 'major modification.'" After attempts to resolve its disagreement with DTE without litigation failed, the United States filed a complaint against DTE and moved for a preliminary injunction. The district court denied the motion for a preliminary injunction. *United States v. DTE Energy Co.*, No. 10-13101 (E.D. Mich. Jan. 28, 2011). DTE then moved for summary judgment, arguing that because it satisfied the recordkeeping requirements, EPA could not bring a New Source Review enforcement action unless and until post-project emissions data demonstrated that DTE's projections were incorrect. The district court granted DTE's motion for summary judgment.

The District Court accepted DTE's argument, which the court characterized as follows:

> Defendants acknowledge that they did not obtain a pre-construction permit. They argue that they were not required to do so because they satisfied their obligations by projecting their post-construction emissions, determining that those projections did not indicate a major modification, reporting these projections to the Michigan Department of Environmental Quality through the submission of a "Notice Letter," and monitoring their emissions post-project. Defendants further argue that so long as certain pre-project requirements are met, [New Source Review] is triggered only if the project in question *causes* an emissions increase, which then demonstrates that the project is *per se* a "major modification." They acknowledge that based on emissions measurements which they have been taking since the project was completed, their project may eventually prove to be a "major modification." That determination, however, cannot be made until the completion of the first year for which such measurements are required. For this reason, Defendants argue that Plaintiff's only remedy, i.e. a post-construction enforcement action, is premature.

*United States v. DTE Energy Co.*, No. 10-13101. 2011 WL 3706585, at *4 (E.D. Mich., Aug. 23, 2011). The court relied in this regard on

the function of the 2002 [New Source Review] rules and Michigan's State Implementation Plan, which lessens the pre-construction burden on existing facilities so long as certain requirements are met. The 2002 [New Source Review] rules provide source operators such as Defendants with the option of either getting a permit before commencing their projects, or measuring their emissions afterward and running the risk of the Government bringing an enforcement action.

*Id.* The district court concluded that a determination of whether the projects at issue constitute a major modification is premature, *id.* at \*5, because EPA "may pursue [New Source Review] enforcement if and when post-construction monitoring shows a need to do so." *Id.*

The court proceeded to reject EPA's challenges to the procedural sufficiency of DTE's notice, upholding both the timeliness and sufficiency of the information reported in the notice. These determinations of adequate reporting are not challenged on appeal. Instead, EPA challenges the district court's holding that preconstruction New Source Review enforcement is flatly unavailable if reporting requirements are met. Although the district court's premises are largely correct, they do not support its sweeping conclusion.

## II.

Over several decades of regulation and litigation, EPA has created a system intended to protect air quality, conserve environmental agencies' scarce resources, and minimize costs for regulated industries. The system depends on operators' making accurate projections before embarking on construction projects. If operators had to defend every projection to the agency's satisfaction, companies would hesitate to make any changes, including those that may improve air quality. On the other hand, if EPA were barred from challenging preconstruction projections that fail to follow regulations, New Source Review would cease to be a preconstruction review program. The 1992 and 2002 changes to New Source Review regulations take a middle road by trusting operators to make projections but giving them specific instructions to follow.

However, this scheme does not contemplate approval of the projection prior to construction. The primary purpose of the projection is to determine the permitting, monitoring, and reporting requirements, so as to facilitate the agency's ability to ensure that emissions do not increase. If there is no projection, or the projection is made in contravention of the regulations guiding how the projection is to be made, then the system is not working. But if the agency can second-guess the making of the projections, then a project-and-report scheme would be transformed into a prior approval scheme. Contrary to the apparent arguments of the parties, neither of these is the case. Instead, at a basic level the operator has to make a projection in compliance with how the projections are to be made. But this does not mean that the agency gets in effect to require prior approval of the projections.

The operator has to make projections according to the requirements for such projections contained in the regulations. If the operator does not do so, and proceeds to construction, it is subject to an enforcement proceeding. The district court in this case appears to have ruled, to the contrary, that no such proceeding is permitted until there is post-construction data. That is not correct. As the Supreme Court has stated, the Clean Air Act "lodge[s] in the Agency encompassing supervisory responsibility over the construction and modification of pollutant emitting facilities in areas covered by the [New Source Review] program." *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 484 (2004). The act's language is clear:

> The [EPA] shall, and a State may, take such measures, including issuance of an order, or seeking injunctive relief, as necessary to prevent the construction or modification of a major emitting facility which does not conform to the requirements of this part.

42 U.S.C. § 7477. These requirements include making projections. 40 C.F.R. § 52.21(a)(2)(iv)(b). They also instruct operators to consider all relevant information, specifically listing some considerations; to include emissions associated with startups, shutdowns, and malfunctions; and to exclude post-project emissions that could have been accommodated during the baseline period and are unrelated to the project. *See id.* § 52.21(b)(41)(ii). DTE conceded at oral argument that EPA could use its enforcement

powers to force operators to make the projection. Oral Arg. at 30:25. EPA's enforcement powers must also extend to ensuring that operators follow the requirements in making those projections. EPA must be able to prevent construction if an operator, for example, uses an improper baseline period or uses the wrong number to determine whether a projected emissions increase is significant. As DTE stated at oral argument, "if [the operator] had misread the rules and used 400 [tons per year] instead of 40 [tons per year as the significance threshold], they would have filed an improper notification, an improper projection, and the agency could then make them do the projection right." Oral Arg. at 31:00. If EPA did not have such power, the project-and-report scheme would not work because the reviewing agency would not have properly-done projections to compare with post-construction data.

On the other hand, EPA's briefs provide a basis for industry's concern that EPA is trying to impose an effective prior approval scheme. EPA repeatedly chastises DTE, for instance, for submitting its projection one day before construction began. *See* EPA Br. at 2, 12; Reply Br. at 3. However, this is fully consistent with a project-and-report scheme. Indeed, the regulation explicitly states: "Nothing in this paragraph (r)(6)(ii) shall be construed to require the owner or operator of [a utility] to obtain any determination from the Administrator before beginning actual construction." 40 C.F.R. § 52.21(r)(6)(ii).

EPA also repeatedly suggests bad faith on the part of an operator that intends to keep its post-construction emissions down in order to avoid the significant increases that would require a permit. *See* EPA Br. at 32–35, Reply Br. at 33–34. However, this is entirely consistent with the statute and regulations. The statute defines a modification as "any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted." 42 U.S.C. § 7411(a)(4). The regulations define a major modification as "any physical change in or change in the method of operation of a major stationary source that would result in: a significant emissions increase . . . of a regulated [New Source Review] pollutant . . . and a

significant net emissions increase of that pollutant from the major stationary source." 40 C.F.R. § 52.21(b)(2)(i). These definitions are incompatible with EPA's argument that New Source Review is a program designed to force every source to eventually adopt modern emissions control technology. *See* EPA Br. at 4–5. As EPA conceded at oral argument, the statute and regulations allow sources to replace parts indefinitely without losing their grandfathered status so long as none of those changes cause an emissions increase. Oral Arg. at 19:08.

To the contrary, scholars have noted that New Source Review has given operators both the ability and the incentive to extend the life of existing sources instead of building replacements. *See* Jonathan Remy Nash & Richard L. Revesz, *Grandfathering and Environmental Regulation: The Law and Economics of New Source Review*, 101 Nw. U. L. Rev. 1677, 1708 (2007). As environmental groups point out in an *amicus* brief, many coal-fired power plants have been able to avoid installing modern pollution controls for 35 years. *See* NRDC Br. at 9. Several scholars have called for changes to New Source Review that would eliminate grandfathering. *See, e.g.*, Nash & Revesz, supra, at 1733; Shi-Ling Hsu, *What's Old Is New: The Problem with New Source Review*, Regulation Magazine, Spring 2006, at 36. It is Congress, not the EPA nor the courts, that has the power to make such changes.

A project-and-report scheme is entirely compatible with the statute's intent, which, as the EPA stated at oral argument, is "to prevent increases in air pollution." Oral Arg. at 19:40. If a company's projections are later proven incorrect, EPA can bring an enforcement action. *See* 40 C.F.R. § 52.21(a)(2)(iv)(b). An operator takes a major risk if it underestimates projected emissions. If post-construction emissions are higher than preconstruction emissions, and the increase does not fall under the demand growth exclusion, the operator faces large fines and will have to undertake another project at the source to install modern pollution-control technology. Because undertaking a second project will almost certainly be more expensive than installing pollution-control technology at the time of the modification, operators have great incentives to make cautious projections.

EPA notes that DTE purposely manages the cost of electricity from Monroe Unit #2 to keep its emissions from increasing. Such actions further the goal of the statute. EPA warns, however, that after the five-year monitoring period is over, DTE could surreptitiously increase its emissions, having permanently avoided permitting for that change. *See* EPA Br. at 32–35, Reply Br. at 33–34. This scenario cannot pass. As EPA itself noted in the 2002 rulemaking, the Clean Air Act "provides ample authority to enforce the major [New Source Review] requirements if [a] physical or operational change results in a significant net emissions increase at [a] major stationary source." 67 Fed. Reg. at 80,204. Electric generation is one of the most highly-regulated industries in the country. Operators are responsible to state environmental agencies, EPA, and environmental groups, who are empowered to bring citizen suits under the Clean Air Act. "Moreover, [the operator's] reviewing authority has the authority to request emissions information from [the operator] at any time to determine the status of [the source's] post-change emissions." *Id.* This monitoring makes it highly unlikely that an operator could escape permitting by waiting five years before increasing emissions. While EPA does presume that emissions increases after five years are unrelated to the project, *id.* at 80,197, that presumption can be overcome, for example, by demonstrating that the preconstruction facility could not handle such an increase. Neither the statute nor the regulations create a time barrier. EPA can bring an enforcement action whenever emissions increase, so long as the increase is traceable to the construction. *See* 40 C.F.R. § 52.21(a)(2)(iv)(b). In light of this, EPA's warnings ring hollow.

Our reversal does not constitute endorsement of EPA's suggestions. A preconstruction projection is subject to an enforcement action by EPA to ensure that the projection is made pursuant to the requirements of the regulations. The district court having ruled to the contrary, we must reverse and remand. But we make no determination as to whether defendants have complied with those projection regulations.

## III.

The district court's order is reversed, and this matter is remanded for further proceedings consistent with this opinion.

———————————

**DISSENT**

———————————

ALICE M. BATCHELDER, Chief Judge, dissenting.  The majority holds that the USEPA may challenge the operator's preconstruction emissions projection, regardless of the actual emissions, and remands for USEPA to pursue such proceedings.  While I agree with much of the majority opinion, I must ultimately dissent for the reasons that follow.

As a preliminary matter, I am uncomfortable with the majority's reliance on statements about the law made by counsel at oral argument.  Four times during its analysis, the majority cites to a *legal premise* that one or another of the appellate attorneys "conceded" or "stated" at oral argument, at least two of which appear to be crucial concessions.  *See* Maj. Op., *supra* ("that EPA could use its enforcement powers to force operators to make the projection," and that, if the operator "misread the rules," USEPA "could then make them do [an improper] projection right").[1]  Given the enormity of this decision, and the effect it may have on every stationary source operator in the Sixth Circuit if not beyond, it would be useful to have a citation to a statute, a regulation, or a case — something more substantive than one advocate's extemporaneous comments at appellate oral argument.

But if we are going to rely on statements by counsel, there is a statement by counsel on appeal, concerning a *fact* specific to this case, that is even more important to the outcome of this decision.  In its appellate brief, DTE's counsel wrote:

> And although not part of the record here, Detroit Edison can represent
> that it submitted to MDEQ a postconstruction annual emissions report
> pursuant to Mich. Admin. Code R. 336.2818(3)(d) on February 28, 2012,

---

[1]To be sure, neither of these issues is in question here:  there is no contention that DTE failed to prepare a projection (it did) or that DTE misread the rules in applying the governing regulation (it did not).  Instead, USEPA relies on its expert's opinion to second-guess DTE's projections.  *See* Appellant Br. at 25 ("EPA can use its projections to demonstrate that the operator should have projected a PSD-triggering emissions increase."); 24 ("The agency can use its own emissions projections to demonstrate that a proper pre-construction analysis *would have shown* an emissions increase.").  USEPA's disagreement is entirely technical and scientific; the dispute is not about the regulation.

> and that report shows no increase in annual emissions at Monroe Unit 2 for the first full calendar year following the project. In fact, that report shows substantially lower emissions from Monroe Unit 2 during 2011 than the unit's emissions before the projects.

Appellee Br. at 25-26. If true, this fact renders moot the case or controversy about *pre*-construction emissions projections — there can be no permitting or reporting violation because there was, conclusively, no major modification. *See* 40 C.F.R. § 52.21(a)(2)(iv)(b) ("Regardless of any . . . preconstruction projections, a major modification results if the project causes a significant emissions increase and a significant net emissions increase."); Mich. Admin. Code R. 336.2802(4)(b). This project caused no emissions increase and, in fact, resulted in an emissions decrease. All of which begs the question: what exactly does the majority anticipate the district court will do with this on remand? Allow the USEPA to challenge preconstruction projections that actual events have already proven correct? I would hold that these subsequent actual results render the present dispute moot.

Finally, even if this were not moot (or if it were appropriate for us to provide advisory opinions on moot questions), I still could not join the majority opinion because I find it logically flawed and, correspondingly, legally incorrect. The majority holds, on the one hand, that this scheme "does not contemplate [USEPA] approval of the projection prior to construction," and "if the agency can second-guess the making of the projections, then a project-and-report scheme would be transformed into a prior approval scheme," which the majority rejects: "this does not mean that the agency gets in effect to require prior approval of the projections." Maj. Op., *supra*. I agree entirely.

But then the majority immediately, directly, and — at least to me — inexplicably contradicts itself, holding that the USEPA can initiate enforcement proceedings to challenge the operator's projections: "The operator has to make projections according to the requirements for such projections contained in the regulations.[2] If the operator

---

[2] It bears repeating that USEPA does not contend that DTE failed to make a projection or failed to follow the regulations; rather, USEPA relies on its expert's opinion to second-guess DTE's technical/scientific projections. *See* n.1, *supra*. If the issue here had been one of the foregoing (i.e., if USEPA had wanted to challenge an operator's failure to make a projection or failure to follow the

does not do so, and proceeds to construction, it is subject to an enforcement proceeding." Maj. Op., *supra*. The majority ultimately holds that USEPA must be able to challenge the accuracy of the operator's scientific or technical preconstruction projections and remands the case for renewed (further) proceedings in the district court on that basis. Let us be very clear, if the USEPA can challenge the operator's scientific preconstruction emissions projections in court — to obtain a preliminary injunction pending a court decision as to whether the operator or USEPA has calculated the projections correctly[3] — that is the exact same thing as requiring prior approval. Put the other way, under a prior-approval scheme, if USEPA disagreed with the projections and forbid construction on that basis, the operator would have to go to the court for a final decision on the projections.[4] The only difference between the scheme that majority endorses and the prior-approval scheme (that the majority purports to reject) is which party is the plaintiff and which the defendant. Otherwise, it is identical.

For the forgoing reasons, I would be inclined to dismiss this appeal as moot. Barring that, I would affirm the judgment of the district court. In either event, I must respectfully dissent.

---

governing regulation — a challenge that would *not* require USEPA to rely on an expert's scientific opinion), that would present different considerations and perhaps result in a different outcome. Because neither of those issues is before us, it is neither necessary nor appropriate to address them here.

[3]The relief that USEPA sought in the district court was an injunction to stop the construction.

[4]Put yet another way, a preliminary injunction is only a viable remedy if this is a *de facto* prior-approval scheme. If prior approval were not necessary, there would be no place for a preliminary injunction to uphold construction.