RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0006p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA (14-2274),

            *Plaintiff-Appellant,*

SIERRA CLUB (14-2275),

            *Intervenor Plaintiff-Appellant,*

    *v.*

DTE ENERGY COMPANY and DETROIT EDISON COMPANY,

            *Defendants-Appellees.*

Nos. 14-2274/2275

_____

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:10-cv-13101—Bernard A. Friedman, District Judge.

Argued: December 10, 2015

Decided and Filed: January 10, 2017

Before: BATCHELDER, DAUGHTREY, and ROGERS, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Thomas A. Benson, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Federal Appellant. Mary Whittle, EARTHJUSTICE, Philadelphia, Pennsylvania, for Appellant Sierra Club. F. William Brownell, HUNTON & WILLIAMS LLP, Washington, D.C., for Appellees. **ON BRIEF:** Thomas A. Benson, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Federal Appellant. Mary Whittle, Shannon Fisk, EARTHJUSTICE, Philadelphia, Pennsylvania, for Appellant Sierra Club. F. William Brownell, Mark B. Bierbower, Makram B. Jaber, HUNTON & WILLIAMS LLP, Washington, D.C., Brent A. Rosser, HUNTON & WILLIAMS LLP, Charlotte, North Carolina, Harry M. Johnson III, George P. Sibley III, HUNTON & WILLIAMS LLP, Richmond, Virginia, Michael J. Solo, DTE ENERGY COMPANY, Detroit, Michigan, for Appellees.

1

DAUGHTREY, J., delivered the opinion in which BATCHELDER, J., joined in the result.  BATCHELDER, J. (pp. 9–14), delivered a separate opinion concurring in the judgment.  ROGERS, J. (pp. 15–29), delivered a separate dissenting opinion.

————————————

**OPINION**

————————————

MARTHA CRAIG DAUGHTREY, Circuit Judge.  This case is before us for a second time, following an order of remand in *United States v. DTE Energy Co.* (*DTE I*), 711 F.3d 643 (6th Cir. 2013).  As we noted there, regulations under the Clean Air Act require a utility seeking to modify a source of air pollutants to "make a preconstruction projection of whether and to what extent emissions from the source will increase following construction."  *Id.* at 644.  This projection then "determines whether the project constitutes a 'major modification' and thus requires a permit" prior to construction, as part of the Act's New Source Review (NSR) program.  *Id.*; *see also* 42 U.S.C. §§ 7475, 7503; 40 C.F.R. § 52.21.  The NSR regulations require an operator to "consider all relevant information" when estimating its post-project actual emissions but allow for the exclusion of any emissions "that an existing unit could have accommodated during the [baseline period] . . . and that are also unrelated to the particular project, including any increased utilization due to product demand growth."  40 C.F.R. § 52.21(b)(41)(ii)(a) and (c).  An operator must document and explain its decision to exclude emissions from its projection as resulting from future "demand growth" and provide such information to the EPA or to the designated state regulatory agency.  40 C.F.R. § 52.21(r)(6)(i)–(ii).

Defendants DTE Energy Co. and its subsidiary, Detroit Edison Co. (collectively DTE), own and operate the largest coal-fired power plant in Michigan at their facility in Monroe, where, in 2010, DTE undertook a three-month-long overhaul of Unit 2 costing $65 million.  On the day before it began construction, DTE submitted a notification to the Michigan Department of Environmental Quality stating that DTE predicted an increase in post-construction emissions 100 times greater than the minimum necessary to constitute a "major modification" and require a preconstruction permit.  DTE initially characterized the projects as routine maintenance, repair, and replacement activities, a designation that, if accurate, would exempt the projects from

triggering NSR.[1] *See New York v. U.S. Envtl. Prot. Agency*, 443 F.3d 880, 883–84 (D.C. Cir. 2006). DTE also informed the state agency that it had excluded the entire predicted emissions increase from its projections of Unit 2's post-construction emissions based on "demand growth." This designation, if it could be established to the agency's satisfaction, also would have exempted DTE's modification from the necessity of a permit and, thus, allowed DTE to postpone some of the pollution-control installations that were planned as a future upgrade.[2] *See* 40 C.F.R. § 52.21(b)(41)(ii)(c). DTE began construction on Monroe Unit 2 without obtaining an NSR permit.

After investigation of DTE's projections, the EPA filed this enforcement action, challenging the company's routine-maintenance designation and its exclusion for "demand growth," and insisting that DTE should have secured a preconstruction permit and included pollution controls in the Unit 2 overhaul to remediate the projected emissions increases. The district court granted summary judgment to DTE, holding that the EPA's enforcement action was premature because the construction had not yet produced an actual increase in emissions. On appeal, we reversed and remanded, holding that the EPA was authorized to bring an enforcement action based on projected increases in emissions without first demonstrating that emissions actually had increased after the project. *DTE I*, 711 F.3d at 649.

On remand, the district court again entered summary judgment for DTE, this time focusing on language in our first opinion to the effect that "the regulations allow operators to undertake projects without having EPA second-guess their projections." *Id.* at 644. The district court apparently (and mistakenly) took this to mean that the EPA had to accept DTE's projections at face value, holding that:

> EPA is only entitled to conduct a *surface review* of a source operator's preconstruction projections to determine whether they comport with the letter of the law. Anything beyond this *cursory examination* would allow EPA to "second-

---

[1]As it turns out, the EPA does not consider a $65-million overhaul to be routine by definition.

[2]Those upgrades have since been completed. Since the Monroe Unit 2 overhaul was completed in 2010, DTE has installed the scrubbers and other pollution controls necessary to remediate toxic emissions at the facility, so that implementation is no longer at issue. Appellee's Br. at 13 n.4. But, if it is found to have violated the Act, DTE still could face monetary penalties and be required to mitigate excess emissions caused by the delay in installing pollution controls.

guess" a source operator's calculations; an avenue which the Sixth Circuit explicitly foreclosed to regulators. [Emphasis added.]

In this case, EPA claims that defendants improperly applied the demand growth exclusion when they "expected pollution from . . . Unit 2 to go up by thousands of tons each year after the overhaul," and then discounted this entire emissions increase by attributing it to additional consumer demand. In other words, EPA does not contend that defendants violated any of the agency's regulations when they computed the preconstruction emission projections from Unit 2. Rather, EPA takes defendants to task over *the extent* to which they relied upon the demand growth exclusion to justify their projections. This is exactly what the Sixth Circuit envisioned when it precluded EPA from second-guessing "the making of [preconstruction emission] projections." [Internal citations omitted.]

The problem with the district court's analysis is two-fold. First, the focus on so-called "second-guessing" is misplaced. That language from our earlier opinion is, technically speaking, *dictum*, because the holding of the opinion was, as noted above, that the EPA could bring a preconstruction enforcement action to challenge DTE's emissions projections. Second, in reviewing an operator's attribution of increased emissions to demand growth, the EPA definitely is not confined to a "surface review" or "cursory examination."

Indeed, two agency pronouncements, dating back to 1992, make clear that the EPA must engage in actual review. The first is in 57 Fed. Reg. 32,314, 32,327 (July 21, 1992), which is quoted in our first opinion: "[W]hether the [demand growth] exclusion applies 'is a *fact-dependent* determination that must be *resolved on a case-by-case basis*.'" *DTE I*, 711 F.3d at 646 (emphasis added). The second is found in 72 Fed. Reg. 72,607, 72,611 (Dec. 21, 2007) (emphasis added): NSR record-keeping requirements "establish[] an adequate paper trail to allow enforcement authorities to *evaluate* [an operator's] claims concerning what amount of an emissions increase is related to the project and *what amount is attributable to demand growth*."

But the EPA cannot *evaluate* a *fact-dependent* claim on a *case-by-case* basis unless the operator supplies supporting facts, which the record establishes was not done here. In other words, a valid projection must consist of more than the following list, which is, in effect, all that DTE provided to the EPA:

Increase in nitrous oxide emissions…………………………......……………4,096 tons
Increase in sulfur dioxide emissions……………….................……………3,701 tons

Total increase in emissions……………………………….........…………….....7,797 tons

Less amount attributable to demand growth……………….......….…………....7,797 tons

NSR projection for post-construction emissions……………..…………………...0 tons

The record before us is devoid of any support for this thoroughly superficial calculation.[3] DTE baldly asserted that it was excluding from its projections "'that portion of the unit's emissions following the project that an existing unit could have accommodated . . . and that are also unrelated to the particular project,' including increases due to demand and market conditions or fuel quality." Mar. 12, 2010 Notice Letter, Page ID 165 (quoting the Michigan equivalent of 40 C.F.R. § 52.21(b)(41)(ii)(c)). DTE then went on to claim that "emissions and operations fluctuate year-to-year due to market conditions," and "[a]t some point in the future, baseline levels may be exceeded again, but not as a result of this outage." *Id.* This letter provided no rationale for the company's claim that Unit 2 was capable of accommodating the increased emissions prior to the construction projects or that future growth in the demand for electricity was the sole cause of the projected increase in pollutants. Although DTE later sent two more letters to the EPA supposedly clarifying the method of calculating baseline emissions, these letters also failed to explain why DTE applied the demand-growth exclusion to its entire projected-emissions increase. In its motion for summary judgment below, DTE claimed that it attributed the increased emissions to future demand for power "[b]ased on the company's business and engineering judgment" (Page ID 6716), but gave no specific information to support that judgment.

In fact, not one of DTE's attempts to justify its application of the demand-growth exclusion was supported by documentation, without which the EPA could not meaningfully evaluate DTE's projections. There was, in truth, nothing to evaluate. Moreover, the results of a

---

[3]Clearly, DTE failed to comply with the regulation requiring it to "document . . . the amount of emissions excluded under paragraph (b)(41)(ii)(c) of this section and an explanation for why such amount was excluded." 40 C.F.R. § 52.21(r)(6)(i).

computer model that DTE ran, when it was rerun by the EPA, showed that DTE should actually have predicted a *decrease* in demand. (Page ID 372) Contrary to DTE's "business and engineering judgment," what did occur in the immediate post-construction period was a decline in consumer demand, not an increase. Appellee's Br. at 64.

DTE's failure to carry its burden to set out a factual basis for its demand-growth exclusion is just one problem with its projections. In order to exclude increased emissions as the product of increased demand under 40 C.F.R. § 52.21(b)(41)(ii), the company must establish (1) that the projected post-construction emissions could have been accommodated during the preconstruction period *and* (2) that the projected emissions are unrelated to the construction project.[4] As to the first requirement, DTE did not and could not establish that the increase in emissions could have been accommodated during the baseline period. Prior to the overhaul, DTE was running Unit 2 at full capacity—that is, Unit 2 was operating every hour that it could be operated. (Page ID 294) But Unit 2 was experiencing continual outages that kept it from running almost 20 percent of the time (Page ID 302), which is obviously why DTE shut it down for three months to accomplish the overhaul, aimed at increasing efficiency and reliability. For the same reason, DTE did not and could not establish that the increase in emissions was unrelated to the construction process. The planned increase in efficiency and reliability would allow the plant to operate for at least an additional 12 days each year (Page ID 306), which in turn would result in increased emissions unless the construction also had included pollution controls, as the issuance of a permit would have required.

In *DTE I*, we referenced the second sentence of 40 C.F.R. § 52.21(r)(6)(ii):

> If the emissions unit is an existing electric utility steam generating unit, before beginning actual construction, the owner or operator shall provide a copy of the information set out in paragraph (r)(6)(i). *Nothing in this paragraph (r)(6)(ii) shall be construed to require the owner or operator of such a unit to obtain any determination from the Administrator before beginning actual construction.*

---

[4]Both requirements must be met. *See New York v. U.S. Envtl. Prot. Agency*, 413 F.3d 3, 33 (D.C. Cir. 2005) (citing 67 Fed. Reg. 80,186, 80,203 (Dec. 31, 2002)) ("[E]ven if the operation of an emissions unit to meet a particular level of demand could have been accomplished during the representative baseline period, but it can be shown that the increase is related to the changes made to the unit, then the emissions increases resulting from the increased operation must be attributed to the modification project, and cannot be subtracted from the projection of post-change actual emissions.").

711 F.3d at 650 (emphasis added). Judge Rogers's current dissent seems to take a broader view of this regulation than the text permits in repeatedly cautioning that permitting the EPA's enforcement action to go forward would create "a de facto prior approval system." (Rogers Opinion at 15, 17, 19) But this reading is patently too expansive, because the regulation does not say that the EPA has to accept projections at face value or that it is prohibited from questioning their legitimacy. Instead, and in context, the rule means that once the required information has been submitted to the EPA for review, the operator does not have to delay construction until it receives a decision on the necessity of a permit, but may commence construction prior to a "determination from the Administrator." Of course, if the operator actually begins construction without waiting for a "determination" from the EPA and it later turns out that a permit was required, a violation of NSR has occurred, and the operator risks penalties and injunctive relief requiring mitigation of illegal emissions, a possible shut down of the unit, or a retrofit with pollution controls to meet emissions standards. *See, e.g.*, *United States v. Cinergy Corp.*, 618 F. Supp. 2d 942, 971 (S.D. Ind. 2009), *rev'd on other grounds*, 623 F.3d 455 (7th Cir. 2010).

In short, DTE was not required by the regulations to secure the EPA's approval of the projections, or the project, before beginning construction, but in going forward without a permit, DTE proceeded at its own risk. The EPA is not prevented by law or by our prior opinion in *DTE I* from challenging DTE's preconstruction projections, such as they are. Viewing the facts in the light most favorable to the EPA, we conclude that there are genuine disputes of material fact that preclude summary judgment for DTE regarding DTE's compliance with NSR's statutory preconstruction requirements and with agency regulations implementing those provisions. Therefore, we REVERSE the district court's grant of summary judgment to DTE and REMAND this case for further proceedings consistent with this opinion.

In terms of the remand, it is important to note that the panel unanimously agrees—now that *DTE I* is the law of this case and of the circuit—that actual post-construction emissions have no bearing on the question of whether DTE's preconstruction projections complied with the regulations. (Batchelder Concurrence at 6, 7; Rogers Opinion at 20) *DTE I* foreclosed that question in holding that an operator who begins construction without making a projection in accordance with the regulations is subject to enforcement, no matter what post-construction data

later shows. 711 F.3d at 649. The district court erred initially and again on remand when it ruled that post-construction data could be used to show that a construction project was not a "major modification." Apparently, it is necessary to reiterate that the applicability of NSR must be determined *before construction commences* and that liability can attach if an operator proceeds to construction without complying with the preconstruction requirements in the regulations. Post-construction emissions data cannot prevent the EPA from challenging DTE's failure to comply with NSR's preconstruction requirements.

---

**CONCURRENCE IN THE JUDGMENT**

---

ALICE M. BATCHELDER, Circuit Judge, concurring in the judgment only. When this appeal was here before, the majority vacated a grant of summary judgment and remanded for the USEPA to challenge DTE's pre-construction emission projections. I dissented because actual events had disproven USEPA's projected (hypothetical) emissions calculations (which were the entire basis for its claim), USEPA had not accused DTE of any noncompliance with any regulations, and the majority opinion was creating a de facto prior-approval or second-guessing scheme. *See United States v DTE Energy Co.* (*DTE I*), 711 F.3d 643, 652-54 (6th Cir. 2013) (Batchelder, J., dissenting). On remand, however, the district court again granted summary judgment to DTE, finding that USEPA had not raised a valid claim of regulatory non-compliance and reasserting that actual events had disproven USEPA's hypothetical emission projections. USEPA appealed again, relying on the prior decision by the *DTE I* majority.

Therefore, this time around we again face the question of whether USEPA may second guess DTE's preconstruction emission projections, using its own hypothetical projections, without regard to actual events. The dissent here would affirm this grant of summary judgment on the basis that USEPA has not raised a valid claim of regulatory non-compliance and mere second guessing is impermissible. That was my view during the prior *DTE I* appeal, as explained fully in that dissent, and I would very much like to agree. But, unlike the prior appeal, this appeal does not present an open issue and I cannot ignore the *DTE I* opinion or pretend that it means something other than what it says. Despite my continuing disagreement with it, *DTE I* is the law of the Sixth Circuit. Consequently, USEPA was entitled to rely on it and the district court was obliged to follow it. More importantly, we must follow it as well.

Simply put, the *DTE I* opinion clearly requires that we reverse the district court's grant of summary judgment to DTE and remand for reconsideration consistent with that prior opinion. Therefore, I concur in the judgment to REVERSE and REMAND, but I do not join any language or analysis in the lead opinion that could be read to expand the prior *DTE I* opinion.

# I.

DTE Energy planned renovations at its Monroe Power Plant. In accordance with all applicable state and federal regulations, it conducted its own determination as to whether the renovations would constitute a "significant modification" that would require a PSD permit, and determined that it would not. Specifically, DTE relied on "demand growth" to predict that its post-project emissions would not increase from its baseline emissions levels and that there was no "reasonable possibility" that this renovation would be a significant modification.

But months later (after construction was well underway), USEPA sued DTE, claiming that—based on USEPA's expert's different hypothetical emission predictions—DTE should have gotten a PSD permit. DTE moved for summary judgment, arguing that a PSD permit was unnecessary based on either its pre-construction prediction or actual post-construction test results, which established that emissions did not increase (and actually decreased) after the renovation. Basically, USEPA wanted DTE to go back in time and re-do its predictions the same way USEPA's expert would have done them, so as to predict emissions increases and mandate a PSD permit, even though actual events had already proven USEPA's predictions were wrong.

The pertinent regulations say: "a project is a major modification for a regulated NSR pollutant if it causes two types of emissions increases—a significant emissions increase . . . and a significant net emissions increase. . . . The project is not a major modification if it does not cause a significant emissions increase. . . . Regardless of any such preconstruction projections, a major modification results if the project causes a significant emissions increase and a significant net emissions increase." 40 C.F.R. § 52.21(a)(2)(iv).[1] I read this last sentence also to mean that,

---

[1]In their entirety:

(a) Except as otherwise provided in paragraphs (a)(2)(v) and (vi) of this section, and consistent with the definition of major modification contained in paragraph (b)(2) of this section, *a project is a major modification for a regulated NSR pollutant if it causes two types of emissions increases— a significant emissions increase* (as defined in paragraph (b)(40) of this section), *and a significant net emissions increase* (as defined in paragraphs (b)(3) and (b)(23) of this section). *The project is not a major modification if it does not cause a significant emissions increase.* If the project causes a significant emissions increase, then the project is a major modification only if it also results in a significant net emissions increase.

(b) The procedure for calculating (before beginning actual construction) whether a significant emissions increase (i.e., the first step of the process) will occur depends upon the type of emissions units being modified, according to paragraphs (a)(2)(iv)(c) through (f) of this section.

regardless of any pre-construction projections, a major modification *does not result* if the project *does not cause* an actual significant emissions increase or significant net emissions increase. But the *DTE I* panel majority did not read it this way, nor did USEPA. According to them, this regulation means that a renovation is a major modification (requiring a PSD permit) if either a USEPA-approved calculation predicts an emissions increase or emissions actually increase. And, despite the fact that the rules delegate calculation of the prediction to the operator (here DTE), and contain no requirement that the operator obtain USEPA review or approval, USEPA deems both the operator's prediction and reality meaningless if USEPA disagrees.

Leading in to *DTE I*, the district court had rejected USEPA's view and granted summary judgment to DTE in a thorough, well-written, and (I thought) correct opinion, explaining that DTE had followed the regulations and predicted no "significant modification," thus excusing it from the permit requirements. Moreover, actual events had proven DTE's prediction correct (and USEPA's incorrect). But, on appeal, the *DTE I* majority reversed, opining that: "[a] preconstruction projection is subject to an enforcement action by EPA to ensure that the projection [wa]s made pursuant to the requirements of the regulations." *DTE I*, 711 F.3d at 652.

I dissented on three bases. First, the subsequent actual emissions data, which showed an actual emissions *decrease*, "render[ed] moot the case or controversy about *pre*-construction emissions projections—there can be no permitting or reporting violation because there was, conclusively, no major modification." *Id*. (Batchelder, J., dissenting). Next, I explained that, regardless of any purported disclaimer that this was not a prior approval scheme, the reality is that "if the USEPA can challenge the operator's scientific preconstruction emissions projections in court—to obtain a preliminary injunction pending a court decision as to whether the operator or USEPA has calculated the projections correctly—that is the exact same thing as requiring prior approval." *Id*. at 653 (Batchelder, J., dissenting) (footnote omitted). Finally, I explained (twice) that USEPA was *not* claiming that DTE had failed to follow the regulations:

---

> The procedure for calculating (before beginning actual construction) whether a significant net emissions increase will occur at the major stationary source (i.e., the second step of the process) is contained in the definition in paragraph (b)(3) of this section. *Regardless of any such preconstruction projections, a major modification results if the project causes a significant emissions increase and a significant net emissions increase.*

40 C.F.R. § 52.21(a)(2)(iv) (emphasis added).

> To be sure, neither of these issues is in question here: there is no contention that DTE failed to prepare a projection (it did) or that DTE misread the rules in applying the governing regulation (it did not). Instead, USEPA relies on its expert's opinion to second-guess DTE's projections. *See* Appellant Br. at 25 ("EPA can use its projections to demonstrate that the operator should have projected a PSD-triggering emissions increase."); 24 ("The agency can use its own emissions projections to demonstrate that a proper pre-construction analysis would have shown an emissions increase."). USEPA's disagreement is entirely technical and scientific; the dispute is not about the regulation.

*Id.* at 652 n.1 (Batchelder, J., dissenting).

> It bears repeating that USEPA does not contend that DTE failed to make a projection or failed to follow the regulations; rather, USEPA relies on its expert's opinion to second-guess DTE's technical/scientific projections. *See* n.1, *supra.* If the issue here had been one of the foregoing (i.e., if USEPA had wanted to challenge an operator's failure to make a projection or failure to follow the governing regulation—a challenge that would not require USEPA to rely on an expert's scientific opinion), that would present different considerations and perhaps result in a different outcome. Because neither of those issues is before us, it is neither necessary nor appropriate to address them here.

*Id.* at 652 n.2 (Batchelder, J., dissenting). If the *DTE I* holding had been that USEPA was limited to challenging only whether DTE had failed to follow the regulation, the *DTE I* majority would have had no basis for reversal, inasmuch as USEPA had not raised any such challenge. Instead, *DTE I*'s inescapable actual holding was that USEPA may use its own expert's pre-construction predictions to force DTE to get a PSD construction permit (or to punish DTE for failing to get a PSD permit), even if USEPA's disagreement is based on debatable scientific or technical reasons and even if actual events have proven USEPA's expert's prediction wrong.

On remand, however, the district court tried to limit the *DTE I* holding rather than just doing as instructed, and once again granted summary judgment to DTE, saying:

> In this case, EPA claims that defendants improperly applied the demand growth exclusion when they expected pollution from Unit 2 to go up by thousands of tons each year after the overhaul and then discounted this entire emissions increase by attributing it to additional consumer demand. In other words, EPA does not contend that defendants violated any of the agency's regulations when they computed the preconstruction emission projections from Unit 2. Rather, EPA takes defendants to task over *the extent* to which they relied upon the demand growth exclusion to justify their projections. This is exactly what the

Sixth Circuit envisioned when it precluded EPA from second-guessing the making of preconstruction emission projections. Moreover, EPA does not point to any regulation requiring source operators to demonstrate the propriety of their demand growth exclusion calculations. And without adequate proof that defendants violated the regulations governing preconstruction emission projections, the instant action cannot withstand summary judgment.

Even assuming that EPA's reviewing authority is as broad as the agency claims, the Court is bewildered by the prospect of what, if anything, the agency stands to gain by pursuing this litigation. Insofar as the government asserts that defendants misapplied the demand growth exclusion, this contention is belied by the fact that defendants have demonstrated, and the government concedes, that the actual post-project emissions from Unit 2 never increased. Therefore, since its own preconstruction emission projections are now verifiably inaccurate, the government is unable to show that the renovations to Unit 2 constituted a major modification.

R. 196 at 3-4; PgID 7515-16 (quotation marks, editorial marks, and citations omitted).

This analysis ignores two major holdings from *DTE I*. First, DTE had already established in *DTE I* that the actual post-project emissions had decreased, so even knowing that USEPA's pre-construction projections were "verifiably inaccurate," *DTE I* still remanded for a ruling on the *pre*-construction projections, rendering the actual emissions legally irrelevant. Second, we were also fully aware in *DTE I* that USEPA was not claiming that DTE had overlooked, misapplied, or violated any regulations; USEPA's only claim was that DTE had scientifically miscalculated the predicted emissions. If the question had been whether or not USEPA could challenge DTE's failure to comply with the regulations, then *DTE I* would have affirmed the summary judgment because USEPA had raised no such claim. And I would have had no need to dissent.[2] Rather, the *DTE I* majority remanded for a ruling on USEPA's claim that DTE had technically or scientifically miscalculated the hypothetical pre-construction emissions.

---

[2]As I said in that dissent: "It bears repeating that USEPA does not contend that DTE failed to make a projection or failed to follow the regulations. . . . [I]f USEPA had wanted to challenge an operator's failure to make a projection or failure to follow the governing regulation. . . , that would present different considerations and perhaps result in a different outcome." *DTE I*, 711 F.3d at 652 n.2 (Batchelder, J., dissenting).

**II.**

Now, USEPA appeals the grant of summary judgment and argues that the district court did not follow the *DTE I* majority's remand instructions.

**A.**

On remand, USEPA re-framed its claims against DTE as noncompliance with particular regulations in an admitted effort to satisfy the *DTE I* majority's purported limiting language. That is, USEPA now argues that DTE violated the regulations "in two critical ways." Apt. Br. at 51. First, USEPA claims that DTE failed to base its predictions on "all relevant information," required by 40 C.F.R. § 52.21(b)(41)(ii)(a), and ignored its own modeling when claiming that any increase was due to demand increases, in violation of 40 C.F.R. § 52.21(b)(41)(ii)(a). Second, USEPA claims that, in applying the demand growth exclusion, DTE excluded emissions that USEPA believed were related to the project, contrary to § 52.21(b)(41)(ii)(c).

According to the *DTE I* opinion, this is a legitimate challenge. In fact, this is a far more legitimate challenge than that which the majority opinion condoned in the *DTE I* appeal. Given the *DTE I* holding, the district court erred by rejecting this challenge.

**B.**

USEPA also argues that "[w]here a source should have expected a project to increase emissions, the work is a major modification and must meet the modification requirements" regardless of "post-project data." Apt. Br. at 54. USEPA relies on the fact that the *DTE I* panel "knew that post-project data showed an emissions decrease, and yet … remanded for further proceedings" anyway; if post-project data were determinative, "there would have been no reason for that remand." Apt. Rep. Br. at 9-10. This reasoning actually applies throughout.

**III.**

Based on the foregoing, I conclude that, because we are bound by the *DTE I* opinion, we must reverse the grant of summary judgment to DTE and remand for reconsideration consistent with that prior opinion. Therefore, I concur in the judgment to REVERSE and REMAND. I do not join any language or analysis that expands or alters the prior opinion.

---

**DISSENT**

---

ROGERS, Circuit Judge, dissenting.  The Clean Air Act requires an operator of a major source of air pollution to obtain a permit before beginning construction on a project that the operator predicts will significantly increase pollution at the operator's source.  In 2010, EPA brought an enforcement action against DTE Energy Company and Detroit Edison Company, alleging that the defendants had violated the Clean Air Act by failing to obtain permits before beginning construction on projects at their power plant in Monroe, Michigan.  DTE contended that EPA's enforcement action was premature because DTE's projects had not yet caused pollution to increase, and the district court agreed.  On appeal, this court reversed the district court's grant of summary judgment to DTE, holding that EPA could bring an enforcement action to ensure that an operator performed a pre-construction projection about whether its proposed project would cause pollution to increase, but that full review of the validity of the projection at the pre-construction stage was not consistent with the statute and regulatory scheme.  On remand, the district court granted DTE's renewed motion for summary judgment, reasoning that DTE met the basic requirements, and also because in any event post-construction emissions had not increased.  EPA appeals.

Because the undisputed facts establish that DTE complied with the basic requirements of the regulations for making projections, the district court properly granted summary judgment to DTE.

I.

A.

This court's prior opinion explains the regulatory framework that governs this case:

The 1977 Amendments to the Clean Air Act created a program titled New Source Review.  New Source Review forbids the construction of new sources of air pollution without a permit. 42 U.S.C. § 7475.  In order to achieve the act's goals of "a proper balance between environmental controls and economic growth," sources already in existence when the program was implemented do not have to

obtain a permit unless and until they are modified. *New York v. EPA*, 413 F.3d 3, 13 (D.C. Cir. 2005) (quoting 123 Cong. Rec. 27,076 (1977) (statement of Rep. Waxman)). Congress defined a modification as "any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted." 42 U.S.C. § 7411(a)(4). EPA requires owners or operators of [major stationary] sources to obtain permits if they plan a "major modification." [40 C.F.R. § 52.21(a)(2)(iii).] A [major stationary] source is anything that has the potential to emit large quantities of a regulated pollutant. [40 C.F.R § 52.21(b)(1)(i)(a).] A major modification is "any physical change in or change in the method of operation of a major stationary source that would result in: a significant emissions increase . . . of a regulated [New Source Review] pollutant . . . and a significant net emissions increase of that pollutant from the major stationary source." 40 C.F.R. § 52.21(b)(2)(i).

*United States v. DTE Energy Co.*, 711 F.3d 643, 644–45 (2013) (footnotes omitted).

The 2002 New Source Review rules,[1] as adopted by EPA in 2002, provide that for projects that only involve existing emissions units, a "significant emission increase of a regulated [New Source Review] pollutant is projected to occur if the sum of the difference between the projected actual emissions . . . and the baseline actual emissions . . . for each existing emissions unit, equals or exceeds the significant amount for that pollutant." 40 C.F.R. § 52.21(a)(2)(iv)(c). To determine whether a project would cause a significant emissions increase, and thus require a permit, an operator must therefore follow three basic steps.

First, the operator must determine the "baseline actual emissions."

Second, the operator must determine the "projected actual emissions." The "projected actual emissions" can be calculated by determining "the maximum annual rate, in tons per year, at which an existing emissions unit is projected to emit a regulated [New Source Review] pollutant in any one of the 5 years (12–month period) following the date the unit resumes regular operation after the project." 40 C.F.R. § 52.21(b)(41)(i). To calculate this amount, the operator must "consider all relevant information, including but not limited to . . . the company's own representations, the company's expected business activity . . . [and] the company's filings with

---

[1]New Source Review actually consists of two programs: "New Source Review for areas classified as 'nonattainment' for certain pollutants and Prevention of Significant Deterioration for areas classified as 'attainment.' Monroe, Michigan actually falls into both categories depending on the pollutant. The two programs are generally parallel and their differences do not affect this case." *DTE Energy*, 711 F.3d at 644 n.1.

the State or Federal regulatory authorities." 40 C.F.R. § 52.21(b)(41)(ii)(a). Further, the operator "[s]hall exclude" from the projected actual emissions "that portion of the unit's emissions following the project that an existing unit could have accommodated during the consecutive 24–month period used to establish the baseline actual emissions . . . and that are also unrelated to the particular project, including any increased utilization due to product demand growth." 40 C.F.R. § 52.21(b)(41)(ii)(c). "Since the most common independent factor is growth in demand for electricity, the exclusion [of this portion of the unit's emissions] is called the 'demand growth exclusion.'" *DTE Energy Co.*, 711 F.3d at 646.

Third, the operator must subtract the baseline actual emissions from the projected actual emissions to determine if the difference between these numbers is "significant." 40 C.F.R. § 52.21(a)(2)(iv)(c). A table in the regulations defines the numeric thresholds that are considered "significant" for each regulated pollutant. 40 C.F.R. § 52.21(b)(23)(i). If the table defines the difference in the projected actual emissions and the baseline actual emissions to be significant, then the operator must obtain a permit before beginning construction on the project. 40 C.F.R. § 52.21(a)(2)(iii). "[A] permit would require the facility to use 'best available control technology' for each regulated pollutant. For grandfathered sources, installing this technology generally leads to a drastic decrease in emissions, even when compared to the preconstruction baseline, at great expense for the operator." *DTE Energy Co.*, 711 F.3d at 645 (citing 42 U.S.C. § 7475(a)(4)).

B.

Detroit Edison Company, a wholly-owned subsidiary of DTE Energy Company, owns and operates the Monroe Power Plant in Monroe, Michigan. In March 2010, DTE began construction projects at Monroe Unit #2, a coal-fired generating unit at the Monroe Power Plant. The projects included the replacement of several components of the unit's boiler tube, including the unit's economizer, pendant reheater, and a portion of the waterwall.

On March 12, 2010, before beginning these projects, DTE submitted calculations about the projects' expected impact on emissions to its reviewing authority, the Michigan Department of Environmental Quality. To make these calculations, DTE used projections that it had

previously provided to the Michigan Public Service Commission. DTE created these projections using a "complex 'production cost model' called PROMOD." PROMOD relies on "a number of company-defined inputs"—such as projected market prices for coal and natural gas and expected outage rates—to predict how much Monroe Unit #2 would be used in the future. DTE projected that in the five years after the projects, Monroe Unit #2 would have its maximum emissions of nitrogen oxide and sulfur dioxide in 2013, with emissions increases of 4,096 tons of nitrogen oxide and 3,701 tons of sulfur dioxide at this time. Both of these amounts are more than 40 tons per year increases of either sulfur dioxide or nitrogen oxide, increases which the regulations deem to be significant. 40 C.F.R. § 52.21(b)(23)(i).

However, DTE concluded that the projects would not result in an emissions increase. To reach this conclusion, DTE excluded all of its projected emissions increases from its "projected actual emissions" under the demand growth exclusion. DTE Vice President of Environmental Management and Resources Skiles W. Boyd stated that DTE determined that its projected increase in emissions was "attributable to demand growth" based on its "prediction that there would be substantial demand for electricity generated at DTE's coal-fired power plants in 2013 due to the predicted price of coal versus the price of natural gas and other factors." Boyd also stated that DTE concluded that it could have accommodated these emissions during the baseline period because Monroe Unit #2 "had greater availability during the baseline period than the highest expected utilization of the unit after the project."

On May 28, 2010, EPA sent DTE a letter asserting that its projects constituted a "major modification" and ordering DTE to produce "[a]ny additional information" that supported its contention that the projects did not require a permit. DTE responded on June 1, 2010, stating that its projected increases were "completely unrelated to the project." DTE explained that at the time that it made its projections "a primary driver for a projected increase in generation (and commensurate projected increase in emissions) from the Monroe Power Plant was an expected increase in power demand accompanied by an increase in energy cost." DTE stated that this "increase in power demand" led to "other factors" that influenced emissions. These factors included the fact that Monroe Unit #2 had no periodic outage scheduled in 2013, the year in which DTE projected that the unit would have its maximum emissions, while it had outages

planned in 2010, 2012 and 2014. DTE explained that Monroe Unit #2 had no planned outage in 2013 in part because an outage was planned for Monroe Unit #1 in this year and "Monroe Unit 2 must help make up the difference in electricity demand." DTE also explained that it had determined that Monroe Unit #2 "could have generated" the projected increases in emission during the baseline period "had the market required the electricity during our baseline period."

The projects concluded on June 20, 2010. Since the projects were completed, emissions at Monroe Unit #2 have not exceeded pre-project emissions on an annualized basis, and actual emissions were less than baseline emissions in 2011 and 2012.

In June 2010, EPA issued DTE a notice of violation stating that the projects "resulted in a significant net emissions increase" and therefore constituted a "major modification" for which DTE was required to obtain a permit. In August 2010, the United States, acting at the request of EPA, filed a complaint against DTE in federal district court alleging that DTE had violated the Clean Air Act by proceeding to construction on a major modification without obtaining New Source Review permits. Soon after this, the district court ordered DTE not to use Monroe Unit #2 "to any extent that is greater than it was utilized" prior to the completion of the projects and granted Sierra Club's motion to intervene as plaintiffs. The district court subsequently granted DTE's motion for summary judgment, concluding that a determination of whether the projects at issue constituted a major modification was premature because EPA "may pursue [New Source Review] enforcement if and when post-construction monitoring shows a need to do so." The district court also rejected EPA's challenges to the procedural sufficiency of DTE's notice letter to the Michigan Department of Environmental Quality, holding that DTE complied with the Michigan state-law equivalent to the New Source Review reporting requirements.

On appeal, this court reversed, holding that while the "district court's premises are largely correct, they do not support its sweeping conclusion" that "preconstruction New Source Review enforcement is flatly unavailable if reporting requirements are met." 711 F.3d at 649.[2] This court explained that the current New Source Review regulations "take a middle road" between requiring "operators to defend every projection to the agency's satisfaction" and barring

---

[2]EPA did not appeal the district court's decision that DTE's notice complied with the reporting requirements. *DTE Energy*, 711 F.3d at 649.

EPA from "challenging preconstruction projections that fail to follow regulations" by "trusting operators to make projections but giving them specific instructions to follow." *Id.* This court explained:

> The primary purpose of the projection is to determine the permitting, monitoring, and reporting requirements, so as to facilitate the agency's ability to ensure that emissions do not increase. If there is no projection, or the projection is made in contravention of the regulations guiding how the projection is to be made, then the system is not working. But if the agency can second-guess the making of the projections, then a project-and-report scheme would be transformed into a prior approval scheme. Contrary to the apparent arguments of the parties, neither of these is the case. Instead, at a basic level the operator has to make a projection in compliance with how the projections are to be made. But this does not mean that the agency gets in effect to require prior approval of the projections.

*Id.*

This court reasoned that the Clean Air Act provides EPA with the ability to "take such measures . . . [that are] necessary to prevent the construction or modification of a major emitting facility which does not conform to the requirements of [the Clean Air Act]." *Id.* at 650 (citing 42 U.S.C. § 7477). Because these requirements "include making projections," in accordance with the rules set forth in the regulations, this court concluded that "EPA's enforcement powers must also extend to ensuring that operators follow the requirements in making those projections." *Id.* EPA could, for instance, bring an enforcement action against an operator who commences construction on a project without making any preconstruction projection. *Id.* EPA could also prevent construction if an operator "uses an improper baseline period or uses the wrong number to determine whether a projected emissions increase is significant." *Id.* This court therefore held that a "preconstruction projection is subject to an enforcement action by EPA to ensure that the projection is made pursuant to the requirements of the regulations" and remanded the case to the district court. *Id.* at 652.

On remand, DTE again moved for summary judgment, arguing that the undisputed facts established that it had complied with the regulations' objective requirements for making preconstruction projections. The district court granted DTE's motion, concluding that this court's decision allows EPA to conduct only "a surface review of a source operator's preconstruction projection to determine whether they comport with the letter of law." *United*

*States v. DTE Energy Co.*, No. 10-cv-13101, 2014 WL 12601008, at *1 (E.D. Mich. Mar. 3, 2014). The district court explained that anything "beyond this cursory examination would allow the EPA" to engage in impermissible "second-guessing" of an operator's calculations. *Id*. The district court determined that EPA had not contended that DTE violated any of the agency's regulations when DTE made its projection but rather impermissibly challenged "*the extent* to which [DTE] relied upon the demand growth exclusion." *Id*. Accordingly, the district court held that EPA's enforcement action failed as a matter of law because there was not "adequate proof that [DTE] violated the regulations governing preconstruction emission projections." *Id*.

Alternatively, the district court held that even if EPA had unfettered authority to challenge the methodology and factual assumptions that DTE used to predict post-project emissions, the district court was "bewildered" by what EPA stood to gain by pursuing the litigation because "the actual post-project emissions from [Monroe] Unit 2 never increased." *Id*., at *2. The district court explained that the actual post-project emissions established that EPA's "own preconstruction emission projections" were inaccurate and that EPA therefore could not show that DTE's projects constituted a major modification. *Id.*

II.

This court reviews the district court's partial grant of summary judgment to DTE *de novo*. *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 629 (6th Cir. 2002).[3] Summary judgment was proper because the undisputed facts establish that DTE complied with the basic requirements for making projections. *DTE Energy*, 711 F.3d at 649–50. EPA contends that it

---

[3]Even though some of EPA and Sierra Club's claims against DTE have not been dismissed, this court has jurisdiction to review the district court's partial grant of summary judgment to DTE based on the district court's Rule 54(b) certification. A "district court may certify a partial grant of summary judgment for immediate appeal" under Federal Rule of Civil Procedure 54(b) "if the court expressly determines that there is no just reason for delay." *Planned Parenthood Southwest Ohio Region v. DeWine*, 696 F.3d 490, 500 (6th Cir. 2012). In certifying such a judgment, the district court must (1) "expressly direct the entry of final judgment as to one or more but fewer than all claims or parties in a case" and (2) "expressly determine that there is no just reason to delay appellate review." *Id*. (quoting *Gen. Acquisition, Inc. v. GenCorp., Inc.*, 23 F.3d 1022, 1026 (6th Cir. 1994)). The district court properly certified its 2014 grant of partial summary judgment to DTE for immediate appeal under Rule 54(b) because the district court entered final judgment on EPA's and Sierra Club's claims relating to DTE's 2010 construction projects at Monroe Unit #2. The remaining claims by EPA and Sierra Club involved DTE's completion of distinct, unrelated construction projects. Further, the district court did not abuse its discretion in concluding that there was no just reason to delay immediate appellate review of its grant of partial summary judgment.

alleged that DTE failed to comply with the express regulatory requirements for making projections by: (1) failing to consider all relevant information when making its projection; (2) improperly applying the demand growth exclusion; and (3) failing to explain its use of the demand growth exclusion. In order to be excluded under the demand growth exclusion, an emissions increase must be unrelated to the operator's proposed project. 40 C.F.R. § 52.21(b)(41)(ii)(c). An emissions increase is not related to the project if the increase is caused by growth in demand for electricity after the project is complete. *DTE Energy Co.*, 711 F.3d at 646. However, an emissions increase is related to the proposed project if the increase is caused by improved reliability, lower operating costs, or other improved operational characteristics of the unit after the project is complete. 61 Fed. Reg. 38,250, 38,268 (July 23, 1996). EPA claims that DTE excluded all of its predicted emissions under the demand growth exclusion even though DTE's computer modeling and project documents predicted that the operational improvements at Monroe Unit #2, rather than an increased demand for electricity, would cause these increased emissions. EPA therefore contends that DTE violated the express requirements of the regulations by excluding emissions that were related to DTE's proposed projects.

Contrary to EPA's contention, there is no genuine issue of material fact about whether DTE's projection complied with the basic requirements for making projections. EPA does not contend that DTE violated the regulations by failing to make any projection. Nor does EPA contend that DTE violated the basic requirements of the regulations. Rather, EPA questions: (1) DTE's interpretation of the relevant information; (2) the methodology that DTE used to reach its conclusion that its predicted emissions increase could be excluded under the demand growth exclusion; and (3) the adequacy of DTE's explanation of why it reached this conclusion.

First, there is not a genuine issue of material fact about whether DTE violated the basic requirements of the regulations by ignoring relevant information. The regulations governing projections require an operator to "consider all relevant information" in determining its projected actual emissions, including but not limited to "the company's expected business activity" and "the company's filings with State or Federal regulatory authorities." 40 C.F.R. § 52.21(b)(41)(ii)(a). EPA claims that DTE ignored the relevant information because DTE created a "best estimate" computer model that reflected DTE's expected business activity and

filings with a state regulatory authority but that DTE then ignored this model when it claimed that its predicted emissions increase was unrelated to its projects. EPA Br. at 39. To support this contention, EPA argues that running DTE's "best estimate" computer modeling with and without the changes caused by the projects showed that DTE's predicted emission increase would be caused by increased availability of Monroe Unit #2 after the projects were complete. *Id*. at 36–37. EPA claims that DTE ignored this modeling when claiming that its predicted increase was unrelated to the projects. EPA contends that DTE instead relied on its principal environmental engineer's "unsubstantiated" belief that a boiler tube component replacement project—like the economizer replacement at issue here—could not cause an emissions increase. *Id*. at 39.

This argument does not show that DTE violated the basic requirements of the regulations by failing to consider all relevant information. This claim is premised upon EPA's attempt to challenge the validity of DTE's conclusion that its predicted emissions increase was unrelated to its proposed projects. EPA does not contend that DTE failed to consider particular sources of relevant information when it created its computer modeling because EPA agrees that DTE's projection was based on a "'sophisticated' computer model" that considered "'exhaustive' inputs." United States Br. at 13. Accordingly, EPA's complaint at bottom is not that DTE failed to consider all the relevant information. Rather, EPA contends that DTE must have misinterpreted the relevant information in order to conclude that its projected increase was unrelated to the projects. The regulations for making projections do not state that an operator must interpret relevant information in a certain way or arrive at certain conclusions after examining relevant information. Error in interpretation of information is not, in short, failure to consider information.

Similarly without merit is Sierra Club's contention that DTE violated the regulations by failing to consider a projection that DTE submitted to the Michigan Public Service Commission. Sierra Club Br. at 13–14. This projection, which was based upon the same PROMOD modeling that DTE used to make its preconstruction projection, projected lower annual system energy demand in each of the five years after the projects than in each of the five years before the projects. Sierra Club contends that DTE's projection that the demand would decline in its overall system is inconsistent with its projection that demand for Monroe Unit #2 would

increase.  Sierra Club Br. at 13–14.  It is true that DTE's statement to EPA that the projected emissions increase at Monroe Unit #2 was due in part to an "an increase in demand for the system as a whole" appears to be inconsistent with DTE's projection to the Michigan Public Service Commission that its annual system energy demand would decrease after the projects were complete.  However, as stated above, DTE concluded that its projected increase in emissions at Monroe Unit #2 was due in part to the fact that this unit would need to generate more energy in 2013 to help make up for an extended outage of Monroe Unit #1 in 2013.  DTE therefore could have projected that demand for energy at Monroe Unit #2 would increase in 2013, even if the demand for energy in DTE's overall system decreased.  The Sierra Club therefore does not show that DTE failed to consider all relevant information in order to conclude that its projected emissions increase was unrelated to the projects.

Second, there is not a genuine issue of material fact about whether DTE followed the basic methodological requirements of the regulations when DTE excluded its predicted emissions increase under the demand growth exclusion.  The demand growth exclusion provides that in making a preconstruction projection, an operator shall exclude the portion of the unit's emissions following the project that "could have [been] accommodated" during the baseline period and that are "unrelated to the particular project, including any increased utilization due to product demand growth."  40 C.F.R. § 52.21(b)(41)(ii)(c).  EPA contends that DTE improperly applied the demand growth exclusion because DTE excluded all of its predicted emissions increase under this exclusion even though its computer modeling and project documents demonstrated that much of its predicted emissions increase was related to the projects.  EPA Br. at 36–37; EPA Reply Br. at 24.  To support this assertion, EPA relies on its expert witness Philip Hayet's opinion that an analysis of DTE's computer modeling showed that Monroe Unit #2 would break down less after the projects were complete and would be able to generate more electricity and emissions.  To reach this conclusion, Hayet used a "standard industry methodology" that ran DTE's model with and without the effects of the projects while keeping all other inputs the same.  EPA also contends that, like DTE's computer modeling, DTE's project documents predicted that the Monroe Unit #2 would generate more electricity and pollution after the projects were complete because Monroe Unit #2 would break down less frequently.  EPA Br. at 37.

However, EPA does not point to any rule in the regulations that establishes that DTE is required to perform Hayet's "standard industry methodology" in order to evaluate whether the predicted emissions could be excluded under the demand growth exclusion. Similarly, EPA does not point to any language in the regulations that establishes the weight that DTE is required to place on its project documents when determining whether predicted emissions can be excluded under the demand growth exclusion. EPA also does not point to language in the regulations that sets forth rules for how DTE should interpret its project documents.

The issue of whether the demand growth exclusion applies to an operator's predicted emissions increase "is a fact-dependent determination that must be resolved on a case-by-case basis." *DTE Energy*, 711 F.3d at 646 (quoting 57 Fed. Reg. 32,314, 32,327 (July 21, 1992)). Accordingly, requiring DTE to establish that its application of the exclusion was more reasonable than EPA's application of the exclusion would turn New Source Review into a *de facto* prior approval scheme by requiring a district court to hold a trial to resolve this issue before the operator could proceed to construction. EPA therefore cannot show that DTE violated the regulations for applying the demand growth exclusion by contending that EPA would have applied this exclusion differently if EPA had been tasked with making the projection.

EPA also relies on EPA guidance about what it means for an emission to be "unrelated" to a project to support its argument that DTE violated the regulations by excluding a portion of DTE's projected emissions increase, which the regulations provide cannot be excluded. This reliance is misplaced. EPA repeatedly cites its statement that an increase in emissions must be "completely unrelated" to an operator's proposed project in order to be excluded under the demand growth exclusion. EPA Br. at 9, 28, 34–35. This statement does not provide operators with instructions about how to determine whether predicted emissions were completely unrelated to proposed projects. This statement also does not codify the methodology that EPA used to determine that DTE's predicted emissions increase was related to its proposed projects. Accordingly, this statement does not establish that DTE violated the regulations for applying the demand growth exclusion.

EPA's reliance on a statement in a preamble to proposed rulemaking from 1996 is similarly misplaced. In this preamble, EPA stated that when "the proposed change will increase

reliability, lower operating costs, or improve other operational characteristics of the unit, increases in utilization that are projected to follow can and should be attributable to the change." 61 Fed. Reg. 38,250, 38,268 (July 23, 1996). EPA seizes upon this language to contend that DTE's prediction that the projects would increase availability and reliability at Monroe Unit #2 is sufficient to establish that DTE's projected emissions increase was related to the projects. EPA Br. at 28, 37. This contention fails because EPA ignores its statement in the preamble that it "declined to create a presumption that every emissions increase that follows a change in efficiency . . . is inextricably linked to the efficiency change." 61 Fed. Reg. at 38,268.

Other EPA guidance also establishes that an emissions increase that follows a change in a unit's reliability or availability is not necessarily related to that change. In particular, in analyzing the 1992 New Source Review rules, EPA observed that "there is no specific test available for determining whether an emissions increase indeed results from an independent factor such as demand growth, versus factors relating to the change at the unit." 63 Fed. Reg. 39,857, 39,861 (July 24, 1998). The EPA therefore suggested not allowing operators to exclude "predicted capacity utilization increases due to demand growth from their predictions of future emissions." *Id.* However, EPA did not remove the demand growth exclusion. Instead, EPA kept the exclusion, recognizing that New Source Review record-keeping requirements establish "an adequate paper trail to allow enforcement authorities to evaluate [an operator's] claims concerning what amount of an emissions increase is related to the project and what amount is attributable to demand growth." 72 Fed. Reg. 72,607, 72,611 (Dec. 21, 2007).

Third, EPA's assertion that DTE violated the regulations by failing to properly explain why it excluded all of its projected emissions increases lacks merit. The regulations require an operator to "document and maintain a record of . . . the amount of emissions excluded" under the demand growth exclusion and "an explanation for why such amount was excluded" before beginning construction on a project. 40 C.F.R. § 52.21(r)(6)(i)(c). EPA contends that DTE violated this requirement by sending state regulators a letter that asserted that the demand growth

exclusion applied to its predicted emissions increase without providing any factual support for this assertion.  EPA Br. at 32–35.[4]

As the district court noted, although DTE's explanation of its use of the demand growth exclusion is not very detailed and "the accompanying table shows the results of the calculations without their back-up data, [EPA] does not point to any provision in [Michigan's equivalent to the New Source Review] rules requiring specificity beyond that which was provided."  EPA also does not point to any regulation that describes the amount of detail that an operator is required to include in order to comply with the requirement to maintain an explanation of the operator's use of the demand growth exclusion.  Allowing an enforcement action in this context would effectively turn the New Source Review into a *de facto* prior approval system.

EPA and Sierra Club's other arguments in support of allowing this enforcement action to continue are also unavailing.  EPA contends that requiring it to defer to an operator's judgment about the projection itself and about whether the demand growth exclusion applies to the operator's predicted emissions increase would result in a voluntary New Source Review program for existing sources.  To support this assertion, EPA claims that it will not be able to effectively evaluate potential increases in air pollution if the reasonableness of the projection and the applicability of the demand growth exclusion are "left to the source's unfettered discretion."  EPA Reply Br. at 28.  However, forbidding EPA from challenging an operator's projection on the basis that EPA would have used different methodology to create the projection or would have reached a different conclusion about whether the demand growth exclusion applied to the operator's predicted emissions increase is not equivalent to leaving the applicability of the demand growth exclusion and the making of the projection to the sole discretion of the operator.  Rather, EPA can still challenge operators who fail to follow the basic requirements of the regulations by failing to make and record their preconstruction projections, by providing no

---

[4]EPA contends that it did not allege that DTE had failed to comply with § 52.21(r)(6)(i)(c).  EPA Reply Br. at 24 n.2.  However, EPA claimed that DTE did not provide an "explanation" to support its exclusion of its projected emissions as required under § 52.21(r)(6)(i)(c) and claimed that DTE had not adequately supported its claim that the projected emissions increase could be excluded under the demand growth exception.  EPA Br. at 32–35.  Accordingly, EPA's allegation that DTE failed to adequately support its use of the demand growth exclusion appears to be based upon EPA's contention that DTE violated the requirement to provide an adequate explanation of its use of the demand growth exclusion under § 52.21(r)(6)(i)(c).

explanation for their applications of the demand growth exception, or by excluding predicted emissions that the operators conclude are related to their projects.

EPA further contends that requiring it to defer to an operator's judgment about whether a predicted emissions increase can be excluded under the demand growth exclusion would require EPA to also defer to the operator's determination about whether an actual increase in emissions could be excluded under the demand growth exclusion. EPA Reply Br. at 28–29. This assertion is unavailing. This court's prior opinion did not foreclose EPA from challenging the reasonableness of an operator's determination that an actual post-construction increase in emissions was unrelated to the project. To the contrary, this court explained that "[a]n operator takes a major risk if it underestimates projected emissions" because the operator will face large penalties "[i]f post-construction emission are higher than preconstruction emissions, and the increase does not fall under the demand growth exclusion." *DTE Energy*, 711 F.3d at 651. Accordingly, this court's prior opinion indicates that EPA does not need to defer to an operator's determination about whether an actual increase in emissions after construction was related to the project.

EPA also contends that *Alaska Dep't of Envtl. Conservation v. EPA* establishes that EPA can also challenge the reasonableness of DTE's preconstruction projection. EPA Reply Br. at 21–23. This contention fails. In *Alaska Dep't*, the Supreme Court held that EPA can evaluate whether a state's imposition of pollution controls in an operator's permit was "reasonably moored to the [Clean Air] Act's provisions." 540 U.S. 451, 485, 488–90 (2004). Unlike DTE's projection, which was made before DTE decided whether it needed to obtain a permit, the pollution controls in *Alaska Dep't* were created after the operator had independently concluded that it had to obtain a permit before beginning construction. *Id.* at 474–75. EPA's ability in *Alaska Dep't* to challenge the reasonableness of pollution controls included in a permit did not turn New Source Review into a *de facto* prior approval scheme by allowing EPA to "in effect . . . require prior approval of [an operator's] projections." *DTE Energy*, 711 F.3d at 649. *Alaska Dep't* is therefore inapposite.

EPA and Sierra Club also contend that EPA's enforcement action must be allowed to continue because a ruling in DTE's favor would harm public health and the economy. To

support this assertion, EPA and Sierra Club explain that DTE's conclusion that it was not required to obtain a permit before beginning construction allowed it to delay installing updated pollution controls in Monroe Unit #2 for four years. Sierra Club Reply Br. at 21–21; EPA Br. at 53. EPA and Sierra Club contend that the increased pollution resulting from this delay resulted in "approximately 90 premature deaths and total social costs of $500 million" each year that the pollution controls were delayed. Sierra Club Reply Br. at 21; EPA Br. at 53–54. As this court previously explained, New Source Review is not designed to "force every source to eventually adopt modern emissions control technology." *DTE Energy*, 711 F.3d at 650. Accordingly, the fact that DTE was able to delay imposing updated pollution controls by "keep[ing] its post-construction emissions down in order to avoid the significant increases that would require a permit" is "entirely consistent with the statute and regulations." *Id*.

The district court relied additionally on the fact that post-project emissions did not actually increase. The underlying purpose of the statutory and regulatory scheme of permitting improvements that do not increase emissions therefore appears to have been met. However, because the undisputed facts establish that DTE complied with the basic requirements for making projections, I do not rely on the district court's alternative reason for granting summary judgment.

I would affirm the district court's judgment.